Case number 16-5377, Nathan Michael Smith, Appellant v. Donald J. Trump, President of the United States Mr. Reams for the Appellant, Mr. Ackerman for the Appellant, Mr. Byron for the Appellant I had a case in Gaston County, North Carolina, it was a jury trial. I was very nervous and I sat at the wrong table and the judge, in front of the whole jury, said, Mr. Griffith, you sit over there. No, you were not the judge. You know the courthouse well. You know the courthouse well. Okay. I recognize this isn't the first time for any of you, but... Good morning. Good morning. How are you, sir? Fine. Your Honors, my name is David Reams. Since I will argue standing, and Mr. Ackerman, my co-counsel, will argue political question, we'll split our time equally six minutes each, reserving three minutes for rebuttal, which we'll also divide. Of course, we'll keep going until Your Honors run out of questions. In August 2015, Captain Smith received odd orders deploying him to Kuwait to support Operation Inherent Resolve, the official name of the war against ISIS. Based on his review of the information available to him, Smith concluded that the war is illegal because the President did not yet, and has not since gotten, specific statutory authorization for the war required by the War Powers Resolution. If Smith is right that the war is illegal, his oath of office and the Supreme Court's decision in Little v. Bereen obligated him to disobey his orders. How did Little obligate him to disobey orders? How did Little obligate him to disobey orders? Because Little established the supremacy of congressional power over executive power in this area. It said that a military officer must disobey an order of the President that is held for various. And we construed Little v. Bereen to apply here and require Captain Smith to disobey his orders. We believe that that decision reinforces his oath of office, which by its terms commits him to defend and protect the Supreme Court. Isn't your better standing argument Allen? Well, I agree with you that Allen is an extremely strong President in our favor. I mean, Little Bereen, that's a tort liability case. I hear you, but why don't you start with Allen? Okay. Allen involved… I'm going to ask you some questions about it. That wasn't a softball, it's a setup. Allen involved a policy requiring school boards to distribute textbooks to parochial schools. The school board members claimed the statute required them to violate the establishment clause. The Supreme Court held that the imposition of that requirement and the dilemma that it would put the school board members in constituted an increase sufficient to give them standing. Because they would have been removed from office. That's correct. That's an important dilemma. We don't have that here. You haven't alleged that here. There's nothing in the complaint that alleges there will be any military discipline here. That's a failing of pleading that's staggering here. You've argued it in your briefs, but nowhere in your complaint do you say that he will be disciplined. How do we know he will be? Well, I don't think it's speculation to assume that a soldier who disobeys orders of his superiors will be disciplined by a court-martial. Why didn't you allege that? You allege nothing about military discipline. Well, we may not have said it in our complaint. We did say it in our… And that's where it needs to be said, right? We look at standing as of the filing of the complaint, what you say in the complaint. I agree, sir. But this report potentially accepted Captain Smith's claim in that respect, in Note 11, where it said that Captain Smith confronted the significant probability that he would… We need to be really careful about jurisdictional issues when we have somebody before us who's asking us to stop an action of the executive branch. These are constitutional issues. And we have case law that says we need to be really careful about such questions and such as standing questions. Furthermore, as of May 2018, he's not in the military. He has no military obligation. He's not on active duty right now, right? He's not on active duty. We don't know if he's recalled that he recalled to this theater of action, do we? Well, the district court found, as a matter of fact, in footnote 11, that there was a significant likelihood or a substantial likelihood that he would be redeployed to support this operation. And I think the court has to accept the district court's findings of that, even though this has been a… What was the basis for that? What was the basis for that finding? How do we know that he'll be redeployed to that area of action? We don't know. We don't know. We don't know. But this court… It doesn't sound like an imminent injury then, does it? But, Your Honor… And as of May 2018, he's out of the military altogether. That's correct, Your Honor. But between now and then, the district court found that it would be a substantial… that he would be recalled. And between now and then, he faces that injury that he alleges. But we don't know that he'll be disciplined. We don't know, sir. But the Attea's decision, which Your Honor wrote, points out that there need only be a substantial risk. We believe that the district court found that there would be a substantial risk. Prospective injury does not need to be impending or imminent. What is the injury? The injury is that, and this goes back to the original issue, that it so then will require him to disobey illegal orders. We're now particularly under Allen. That's where the discussion has gone. Is this case more like Allen or is it more like, I don't know the pronunciation, something like Rodearmo, the Clinton appointment case? In other words, in the Clinton appointment case, Rodearmo or Rodearmo, whatever it is, the court noted that the defendant, the plaintiff himself, was not being called upon to commit any unconstitutional act. Is the officer here being called upon himself to commit any unconstitutional act? Well, he would be required to support an operation that was ultra-virus, and that would be the constitutional injury, ultra-virus of the President's powers. I thought you claimed the constitutional injury was that he would not be required to violate his oath of office. Well, it's intertwined. He has to support and defend the Constitution. That's his oath. Against all enemies, foreign and domestic, who's the enemy? There's no enemy, Your Honor. So how does that violate his oath? Because, regardless, he's still required to support and defend the Constitution of the United States. Against all enemies, foreign and domestic. Yes, sir. But we believe that his obligation extends to defending the Constitution writ large. You know, every federal officer takes the same oath. That's not unique. You doubtless know this. I mean, it's not unique to military officer. Every federal officer takes that oath. Yes, Your Honor. So does that mean that because somebody in the State Department is somehow involved, that they have standing to sue over the legality of the operation in Iraq and Syria? Of course not, Your Honor. It's just the military? This is just the military. It's an oath that is separately prescribed. But what about the people in the State Department who are involved? What about the people within the Office of the President take that oath as well? They take that oath, but it is not under a statute that is specific to the military and is not under a statute whose legislative history shows that it was meant to apply to officers in the military. The statute you're talking about is the oath statute? The oath statute. It's 31? Yes. It's derived just like the other oath. It's exactly the same as the oath that is taken by every other federal officer. I mean, there's a difference. The President takes an oath derived from the Constitution. Judges take an oath derived from the Judiciary Act of 1789. But these other oaths are all derived from the same source, and it was the ironclad oath of loyalty which began during the Civil War and then went on and on and on. More provisions were added to it until the Supreme Court declared it unconstitutional in Cummings v. Missouri. So the origin of both oaths, military and civilian, are exactly the same. Yes, Your Honor, but first we distinguish the oath that the military officers have to take by the legislative history that shows that they were once required to obey the President, and now they're required to obey the Constitution. Nonetheless, it's the same oath, and how is he being required to violate that oath any more than the Foreign Service officer in the Department of State in the Clinton case was? Well, that's where we believe that little B. Boreem comes into play, and, of course, that depends on Your Honor's interpretation. Do you seriously think that there's any more obligation on a military person created by Little v. Boreem than the obligation created by law on all other officers to obey their superiors? By statutory law, yes, I do believe that Little changes the equation for military officers. So military officers have a greater duty to disobey their superiors, to make their independent judgment on close questions of constitutional law, and then disobey their superiors have a greater obligation to do so than a Foreign Service officer in the Department of State. Arguably, yes, Your Honor. Arguably? Well, we haven't felt that. It's arguably good enough to get us standing here, Counsel. Oh, well, I'll say that. I don't know why it would be even arguable that they have a greater duty to disobey their superiors. The military has a greater duty to disobey their superiors than a Foreign Service officer does. If there is such a duty, it's not clear to me why it's any different for those two officers. Well, just to make clear, Captain Smith is not proposing to disobey in order he wants to. I thought that was the gist of his standing. His oath-taking argument was that he either has to comply with his oath or disobey orders. That's correct, Your Honor. If he isn't considering disobeying orders to be an element, a factual element of what's going on here, then why does he have standing? Because the order would require disobedience if it is illegal. He believes it's illegal. He has not received authoritative guidance from the administration as to whether it's legal or not, and therefore he's asking the court to declare that it's illegal. Now, if I may address a point that Your Honor raised, Judge Sentel and Judge Griffith raised, he's not trying to block the war against ISIS in Iraq. He's not trying to enjoin the conduct of war, which I believe is Your Honor's issue. He's only asking for a declaratory judgment that Operation American Resolve is illegal. How is that any more than an advisory opinion which we cannot constitutionally grant? It's more than an advisory. An advisory, a declaratory judgment to have force has to have some real-world effect to be more than just an advisory opinion. I mean, that's not precisely the language of the cases, but we pretty much said you can't just come in and get an opinion of law. It has to have actual effect in a real case or controversy. Your Honor, as we said at the end of our reply brief, we presume, and the Supreme Court presumes, that if a statute is declared to be unconstitutional, it's to be presumed that the executive branch will obey the court's rulings and implement its decision. So doesn't that bring us back to you're asking us to stop the war? No. I'll explain why. You're saying that your man has standing because it would be an unconstitutional war. You're saying that what you want is a declaration that's unconstitutional, and I say, well, what's the effect of that that makes it an article-free question? You say, well, we presume the executive will comply with it. I can't make those two come together. We're saying that the authorization for Operation Inherent Resolve violates the War Powers Resolution because the President did not get the congressional authorization that the War Powers Resolution violates. If the court rules that Operation Inherent Resolve is invalid for that reason, we can presume, and the Supreme Court said we should presume, that the President will look at that decision and go to Congress to get the necessary support. You're not getting it four packs where you were before. You're asking us to say that what President Obama was doing or President Trump is now doing in the Middle East is— you use the terms back and forth unconstitutional or illegal. I understand your more specific argument is it violates the War Powers Act, but that makes it unconstitutional because you'd say the President didn't have the power under the— nobody talked about Youngstown in the brief, which surprised me greatly. Well, as a matter of fact, we did talk about Youngstown in the brief. Very briefly. I'll leave that to Professor Ackerman. Which I like. I like things to be brief. Don't misunderstand me. Understood, Your Honor. Under Youngstown, you would say that this would be unconstitutional if the War Powers Resolution is not complied with. Is that correct? I think that Professor Ackerman will address that issue. I won't pretend to speak for him. Are you familiar with Holtzman v. Schlesinger? Yes, that's— That's comparable to this case, isn't it? I don't see how it is, Your Honor. They were Air Force officers in addition to Elizabeth Holtzman, who were the plaintiffs in that case. And Justice Douglas issued an injunction against the President to stop— or against the Secretary of Defense to stop the bombing in Cambodia. And you know what happened to that injunction? Yes, sir. But we're not seeking an injunction. It was 8-1. The Supreme Court vacated it. We're not asking for an injunction. We're asking the Court to declare that there's been a violation of law so that the President— But you were then supposed to presume what tells the President to comply with the law by not doing what he's doing in the law. So the President can bring himself into compliance with the law, which we presume that he will do, that he will go and get authorization from Congress. All right. Thank you, Your Honor. Thank you. Thank you. May I please, Court? One point in response to the previous standing conversation. There are two statutes, the oath statute for officers, which requires the oath to support and defend the Constitution, and a second statute for enlisted personnel, which does not require enlisted personnel to support and defend the Constitution, but to obey the orders of the President. Well, no, it does. I'm reading from it. It's support and defend the Constitution against all enemies, foreign and domestic. I think the provision you want to refer to is in the 3331. There's an independent obligation to bear true faith and allegiance to the Constitution. I'm not talking about the officers. I'm talking about the enlisted personnel. Right. And that's what I was reading. Yes. Please read that again. Do solemnly swear that I will support and defend the Constitution of the United States against all enemies, foreign and domestic, and that I will bear true faith and allegiance to the Constitution. It's the other. I'm sorry. But this is key. That is to say, these two statutes, as Judge Randolph suggested, emerge out of the Civil War experience. It is of fundamental importance whether officers followed Robert E. Lee or not. The fate of the Union depended on this. And defending the Constitution against all enemies, foreign and domestic, was of key importance here, while the enlisted personnel are supposed to follow the orders of the President. Now, as the late Justice Scalia says in his book, it is a fundamental principle of statutory interpretation to respect variant meanings, which are focused on the military problem. The military is central to the coercive authority of the state, unlike any other officer of the United States government, other than the court. That is to say, if the President of the United States were to order, not say that he will, but if he were to order the First Infantry Division to occupy Capitol Hill, the officers have an obligation under their oath not to do it, in a way that the Secretary of State and others, they are important, but they are not central to the coercive authority of the state. Don't they have exactly the same language in their oath? But it's a different statute. That's a yes or no question. Yes, it's a different statute. Yes, they do have exactly the same language. But in a different statutory context. It's a different statute that's requiring this oath. And we have to interpret the statutes. That's what your job is. So if the President told the Director of the United States Marshal Service, send in the U.S. Marshals to occupy Capitol Hill, they would not have a duty to disobey him. But if he told the General to send in the troops, they would have enough. You are correct. Do you have anything to base that on? The two statutes. There are two statutes. That's right. There are two statutes. Which is identical language, and that's another thing Scalia says. If you have identical language and statutes, you presume it to mean the same thing. But these statutes, well, we have a number of statutes here. And we have two focused, as Judge Randolph pointed out, to this very crucial moment in the history of the Union. And they are self-consciously different. And the modern versions are self-consciously different. And they are directed to military officers. You can interpret other statutes in their appropriate statutory context. But to return to purpose, Professor Ackerman, of the original statute from which this was, both of these things were derived, was to make it easier to prosecute Confederate spies. That was the purpose. One of the purposes, sir. Another purpose was to, as clearly as possible, commit the graduates of West Point, a very small number of elite personnel and other officers, to the Union. There are several purposes. To return to the merits, our position on political question does not invite this Court to assess the wisdom of particular military strategies, as in al-Shifa and al-Hijab. What focuses instead on the district court's failure to acknowledge that the War Powers Resolution requires Article III judges to recognize that President Obama's powers were at their lowest ebb in initiating hostilities against ISIS in 2014, and that in the words of Justice Jackson's canonical opinion in the steel-seizure case, the judiciary was obliged to scrutinize with care the President's rationales for failing to obtain an AUMF within 60 days. Since the integrity, as he insists, of our system of checks and balances is at stake. What is our recent case in bin al-Hijab, or I may not be pronouncing that right, what does that do to our political questions? And this is also a response to Judge Santel, a previous question of Judge Santel. If you issue your declaratory judgment, it does not change any military strategies initiated after this declaratory judgment. It declares, however, that if the President, that the President Obama and President Trump have, in good faith, misinterpreted the requirements of the War Powers Resolution, and that the President has 60 days to gain the consent of Congress. If he fails to do it, he has 30 days to remove the troops. Period. This is an operational declaration which informs the present President that, in good faith, he has, in fact, failed to confront the key legal issues involved in interpreting the AUMFs of 2020. And I'm sorry, I understand that argument. How does that relate to bin al-Hijab? That is to say, these two cases involve judgments on military strategy. The case, the declaratory judgment here, does not involve. So if we agreed with you, tell me, what is the legal analysis the court would go through to make the determination whether the action against ISIL? Precisely. So let's turn, because the claim, the President Obama recognized the relevance of the War Powers Resolution, which is a necessary and proper clause application of the War Powers Clause of the Constitution. He recognized it in making his speech of September 10th, announcing an open-ended conflict against ISIS, and then following it up with the letter of September 27th. And then asserted, without providing any opinion of a serious kind by the OLC or the White House Counsel at any time, that the two previous AUMFs cover this case. Legal question number one. National Security Advisor Rice wrote a letter to the Speaker of the House two months earlier, declaring that the 2002 AUMF no longer has supported any use of American troops as of December 18th, 2011, three years before. This is on the basis of the, this is the consequence of President Obama's refusal to renew the Forces Agreement, because the government of Iraq refused to permit court-martial jurisdiction against terrorists. And that was a condition for renewing it, and it didn't happen. And so we ended our occupation forces at that point. And this is brief and presented in the district court. So the question of law is, given that Secretary Rice stated that the 2002 AUMF does not apply, has not applied for three years in an official form to the House of Representatives, what justified the President two months later to assert that it did? That's the question of law. Is that the question, or wouldn't we start the inquiry by picking up the two AUMFs and reading them, and then having to make a determination whether ISIL is covered by them, right? Wouldn't we start with just the text of the AUMFs? I think not. I think you should defer to the present. You know, the question is whether, given the fact that the President, knowing everything that he knows, has interpreted them in this way, to do it the way you suggest, Judge Griffiths, would engage in the kind of activity that, upon reading and rereading the two cases, Ali Jaber, is precisely the sort of thing that the Court rightly is reluctant to do. I thought part of the learning of Zivotofsky 1 was that when it is a task that we are equipped to do, we're not equipped to make, in El Shifa, we're not equipped to make military judgments about whether certain activities are appropriate or not. But one of the things that courts can do is pick up an act of Congress and interpret it. And I thought that was part of what the Supreme Court was teaching us in Zivotofsky 1, is there's a statute there, read the statute, construe it. So that's why I began my question, aren't we supposed to start with AUMF? And you're saying no. Well, you should start with the AUMF, but then defer to the judgment of the President on the basis of all the information available to him that he could not, in good conscience, continue the status of forces agreement given the Iraqi government's refusal to guarantee court-martial jurisdiction and protection for arms. Well, this is very interesting, but there's a preliminary question that's lurking over it all, and that is that the courts have never subjected the President of the United States to a declaratory judgment, which is what you're seeking here. Do you agree with that historical representation? There are two responses here. Well, the first question is, do you agree with that representation that I just made, that the courts have never subjected the President of the United States to a declaratory judgment? Yes. So this would be a first. Because we couldn't identify with clarity the officers subordinate to him in the State Department, et cetera, who should be named. If we could, we would amend the complaint to do that. But, you see, because it isn't only the Secretary of Defense, it isn't only the military. There is the CIA, which is engaging in operations. There are many agencies, and we don't know which they are. And that was the reason we named the President. But this is if we could, because we didn't want to have you issue a declaratory judgment than someone who is not within the chain of command operates. The legal issue number two, on the 2001, of course there are many, but I don't want to. I do want to insist, though, that first, and this is troubling, this letter, official letter to the House, the Speaker of the House, by a National Security Advisor, Rice, was filed and then mysteriously disappeared sometime in 2016. We only tracked it down through the Wayback Machine. This, the officer, no official statement of the administration has ever addressed the legal problem that we have. I have isolated it. It's for you to decide that. But it is especially important under the principles of Justice Dax's opinion, classical concurrence opinion, to scrutinize with care the rationales offered up by the President when in a type three case, which is this case, where there's a statute that provides clear rules, 60 days, 30 days, and clear standards. You have to. It's the initiation of hostilities. There's no question under Section 8C that, which is a very broad definition, that the President initiated hostilities. And therefore, the question is, why didn't he obtain the authorization in 60 days as required? And the answer that the President gave was the 2002 AUMF, especially concerning Syria, because we are invading Syria. There's an Iraq, it was an Iraqi resolution. There's another problem with the Iraqi resolution. Professor, one of the concerns I have is we don't, as Judge Randolph pointed out, this would be extraordinary because no declaratory judgment has been entered against the President. It would also be extraordinary in that where's Congress? Congress doesn't seem to be complaining about this. They're appropriating funds for it and earmarking them for the operation in Syria. What we have here, it seems to be, is no conflict between the branches on this. So to have the courts come along and intervene where Congress doesn't seem to be as concerned as you are or as others may be, that would be itself extraordinary. The entire point of the War Powers Resolution was to place the burden. And it's not apparent. I mean, basically what happened since 1971, the Gulf of Tonkin Resolution is repealed. And President Nixon, making the same claim of commander-in-chief power, escalates the war. And it's precisely that which the War Powers Resolution is about. It actually hurts your argument in that look how that was resolved before. It was resolved between the political branches. The steel seizure case, I mean, there are several different questions here. The first one is, is, as the district court below held, the Baker against Carr criteria, which you are invoking when you're talking about the approach of creations. I'll get back to the facts about that in a moment. Are those the right criteria, or is steel seizure the right case? Well, what is what Judge Griffiths suggests, at the very least, take it out of Box 3 of the Tripartite Steel Company analysis, because there's not the conflict between the President and the Congress that triggers the Category 3 denomination of a controversy. Within the statute? And by the way, I prefer to think of it as names in more of a region triumvirate, because that actually was the law of the case where steel company was a concurrence. It was not in the majority. It should be emphasized, I should say, that when we're going back to steel seizure for a moment, Mr. Justice Frankfurt, who is Colgrove against Green, which is Brennan finally changes that in Baker against Carr, he agrees that he does not uphold the political question doctrine, but rather in an analytically identical case, insists on the Type 3 characterization. What we have is Taft-Hartley is voted into effect over President Truman's veto, just as this case, the WPR, is voted over President Nixon's veto. Taft-Hartley grants the President, however, as does the WPR, a 60-day special unilateral period for suspending strikes. For national security reasons, his generals tell him that if we don't have the production, we're going to endanger the troops in Korea. Here, it's an, if anything, easier case. We have a 60-day period for the President to do something. He can exercise unilateral power for 60 days, but then he has to, in this period, get congressional approval. So this is analytically the same kind of case. Not quite. Go ahead, please. Who was Sawyer? Yes, but you're right. It wasn't Youngstown Sheet and Tube versus Truman. I understand. It was Youngstown. You're absolutely right on the question of who should be the proper defendant in this case. And I've explained, as best I can, why we did what we did. But we would, you know, if the only problem is, you know, taking the President out and putting all the people, if we could identify, all the officials, if we could identify them in, I'm with you on that. Well, that's not the point. The point is that we don't have to decide whether there are any other problems. If you can't sue the President, that's the end of the case. Why should we go off into the blue yonder deciding whether this is a political question or whether this is that and, you know, so on and so forth? The reason we sued the President is because we could not identify inferior officers. That's the reason. But to return to the question under about the cooperation between the two, that is, of course, presupposes that it's Baker against Carr rather than the sealed seizure case, which is applicable because the statute itself, the WPR, the War Powers Resolution itself, says, Appropriations measures shall not be construed as explicit authorization. First. Does that necessarily mean they can't be considered in determining which block this belongs in, that is to say, the third or box or the third or second? Well, you see, what box three means is you have to interpret the statute. That's that's it. And and then you have to interpret the two AUMFs, which are said to be justifications for not getting explicit consent within a 60 day period. So once we say how we have to interpret the statute, then a section, I think I sometimes understand that's the government's argument. No, we're in the zone where the president is acting with congressional authority. Yes. I don't think there's a Youngstown line on this. These supplemental authorization bills at the most generous count represent the money for these these warrants represents four percent of the total amount. Moreover, the government and district court, more importantly, cite the summary of the bill, the authorization bill, without actually looking at the statute itself. The statute, as we elaborate, contains explicit disclaimers that this is in compliance with the War Powers Resolution. So even if it were the case that we should not interpret the we shouldn't follow the statutory. Let's hear from the. Thank you very much. Good morning. Please report Thomas Byron from the Justice Department for the government. I want to start as plaintiffs have been standing. Your Honor, I want to emphasize at the outset that the plaintiff in this case has not identified any illegal or unconstitutional conduct of his own that he would be compelled to undertake. And that would constitute the kind of injury, in fact, that might infer standing. Instead, the only illegality he complains of is what he says the president has done without congressional authorization. Do you agree that Alan is where we ought to be looking for standing? Well, Judge Griffith, I think there are really important differences between this case and Alan that I'd like to talk about. And I do think, as you know, we shouldn't be looking at Alan. So I think looking at Alan doesn't get the plaintiffs where they need to be is the short answer to that. I'm not concerned with that. I'm concerned with what we ought to be doing. What's the standard we should use? And is Alan the law that we ought to be using? So, Your Honor, this Court has not yet addressed whether the footnote in Alan continues to be good law in light of subsequent Supreme Court decisions. The Supreme Court has cited it later, right? Approvingly. Well, I don't think the Court has considered the question whether an oath alone is adequate. But I also think it's really important to recognize that notwithstanding the language of Alan, what the Court was considering there was a situation where the board members themselves believed that they would be compelled to take action that would itself violate the Constitution. And that that was the – that is the significant difference between that case and this. So that here, the plaintiff has not identified any unconstitutional conduct that he has been ordered to undertake or would conceivably do it. So doesn't that bring it within the Rodeo-Muller, however that case is pronounced? Yes, Your Honor. President from this Court. I think that's exactly right, Justice Ginsburg. Rodeo-Muller was directly on point. The three-judge court in that case correctly recognized that where – that if the only claim is that a Federal official has sworn an oath to protect and defend the Constitution but hasn't identified any illegal or unconstitutional conduct of his own, that there is no standing. Would the participation in the unlawful war would be a violation of his oath? No, Judge Griffith. So looking now at the War Powers Resolution, if that's the source, or at the Constitution, nothing in either source identifies any right or obligation on the part of individual military officers to refuse to participate in a war merely because the individual officer questions whether Congress and the President are aligned with respect to authorization to conduct the operation, right? So again, if you look at the text of the War Powers Resolution, nothing there suggests that Congress intended to confer individual rights or responsibilities or liability on military officers themselves. It's solely about the ongoing – I'm getting back to – you're trying to distinguish the facts of this case from Allen, and I guess I don't understand it. In Allen, the members of the school board feared that they would be removed from office if they did not comply, right? How is that different than this case? He fears that if he refuses to engage in a war that he thinks is unlawful and unconstitutional, that he will be disciplined. Tell me how that's different. So, Judge Griffith, I think there's a couple points on which it's different. I want to emphasize at least two or three. One is that unlike in Allen, there's no suggestion that merely by participating in Operation Inherent Resolve and on the theory that the President and the Congress have not done what the plaintiff here believes they should do, that that makes his participation unconstitutional. It violates his oath. No, I think that's not right, Judge Griffith, and that's what Rodiermo said. If it is unconstitutional, he's violated his oath, hasn't he? No, I think that's not how it works, Judge Griffith, and there's no case law. I'm sorry, what do you mean that's not how it works? Well, so – Tell us how it works, and maybe you want to adopt a different tone. Sorry, Your Honor, I certainly didn't mean to – In Rodiermo, the Foreign Service officer would have been complying with the directives of an unconstitutionally appointed Secretary of State, but he was not himself being directed to commit anything that was independently unconstitutional for his act. What does an oath mean, then? I have a question for you. What does an oath mean? Judge Griffith, I think an oath is a solemn undertaking to respect the obligation to protect and defend the Constitution. Going back to the difference between Rodiermo and Allen, in Allen the officials would actually have been themselves taking the act of appropriating funds unconstitutionally, where the actions being conducted by a subordinate officer generally are not in themselves unconstitutional. It's something that their department or their country is doing that's unconstitutional. I think that's exactly right, Judge Santonio. Looking at the difference in the constitutional issue presented in Allen and in this case, the constitutional issue in Allen, the establishment cause concern, was directed at the government officials who were plaintiffs in that case. In this case, the constitutional directive is as between the President and the Congress, between the two political branches. There's no obligation imposed on individual military officers with respect to whether those two branches have aligned themselves in their ongoing dialogue about authorization for military force. And so that, I think, Judge Santel is exactly right. That's how I see the difference between this case and Allen. And I think, Judge Griffith, you're right to point out that the court in Allen, in the footnote, which is a very brief discussion of the standing question, didn't address it in those terms, to be sure. But I think in light of subsequent cases in the Supreme Court, it's important to recognize that there does need to be an injury in fact identified. And that that's, I think, the only way to make sense of that case, that holding. So, again, we think that is the key difference here, that nothing in the War Powers Resolution, nothing in the constitutional provisions at issue, suggests that the kind of injury the plaintiff here has alleged is adequate to support a finding of injury in fact. So on that basis, the district court correctly recognized there's no standing here. The questions that the plaintiff has raised about whether there is, whether it's substantial likelihood or imminence is required, really don't make a difference. I would say that footnote 11 doesn't say anything about the substantial likelihood standard. Instead, it was just about whether a dispute is capable of repetition, perhaps avoiding review. Slightly different question. But, again, none of that matters because the injury they've identified is not a cognizable injury for standing purposes. I'd like to point out as well that both standing and the political question doctrine are independent bases. And Judge Randolph, as you pointed out, there is also the concern that the president should not be subject to a declaratory judgment. That's equally an independent basis that this court could use to affirm the dismissal in this case. If the court has no further questions. Yeah, no, I have a further question. Certainly. So what if the president were to initiate hostilities with a nation or organization that wasn't plausibly within these EAUMFs? Would that be subject to review? Judge Griffith, I think whether, no, I think is the short answer. No. No. And the reason is this, that the question about the authorization with respect to the president's power and Congress's power as allocated by the Constitution and as spoken to in various ongoing dialogues between the two political branches is one that is simply not suited for judicial resolution. Now, what you've asked is whether a harder case on the merits than this one, because this one is an easy case on the merits, but, of course, we're not asking the court to reach the merits. Whether a harder case on the merits would be justiciable, I think no, because those justiciability concerns are properly raised and considered. Under what circumstances would the judiciary be entitled to limit the president's exercise of his war power? Help me understand that. It's asking me like you're saying none. There are none. Well, I think what I'm saying is we haven't seen any yet, Your Honor. Well, we've seen the litigation of collateral consequences in Little V. Burimi that your friends are relying on over there. Yes. And before that, you had Bass V. Tingey where the question came up as to whether the Kwesi War was, in fact, a war. So the courts have become involved in the president's exercise of the war power. Sure. Judge Sentelle, and I think plaintiffs have also relied on the habeas litigation in Guantanamo Bay detainee cases. There's a lot of circumstances in which sort of collateral issues may address those questions. Yes. Both Burimi, Little V. Burimi and the Bass V. Tingey involved civil consequences in the Little case and the damage he's claimed against Captain Little and then Bass V. Tingey, the size of the forfeiture and the salvage in Admiralty. But it was ways in which the court did examine, first, that there was a war, and second, how far did it extend? And, Judge Sentelle, I think it's important, as you just pointed out, to recognize that those cases arose in Admiralty, which is a specific authority that the federal courts have jurisdiction to consider. Here, the claim is that the courts should police the relationship between the political branches in an area where Not necessarily. What limit does the AUMF place on the president, then? Any? Judge Griffith, I think it does place limits on the president. Yes, because I remember in the Guantanamo cases, we had to struggle with the meaning of the AUMF and who was affiliated with it, who was associated with it, and so presumably we were doing that because it meant something. It meant that we could find a category of people who were outside the AUMF. You'll grant us that, won't you? Absolutely, Judge Griffith, and that was the point I was making a moment ago in discussing Why not the argument that what we have in front of us now is just another example of that? We have an entity that is beyond the scope of the AUMF. Why can't we look at that? Because the plaintiff matters, Judge Griffith, and that's what the standing doctrine tells us, and so the If we got by plaintiff, if I thought, you know, Allen controls here, and I disagree with your reading of it, and I thought that there was standing and had to deal with that, how would you help me think about that? Why would that inquiry, looking at the language of the AUMF and deciding whether ISIL fits within it, why would that be any different than the inquiry we undertook in some of the Guantanamo cases? Why would that be any different than what the Chief Justice told us we do in Zivotofsky? So turning first to the AUMF question, Judge Griffith, I think the difference would be that in the Guantanamo cases the court was not being asked to determine whether the action was necessary and appropriate, for example, which is the language of the AUMF that would be at issue in this claim. Instead, in those cases, the question was about associated forces, for example, or the initiation of hostilities. That's not what the plaintiff here is asking the court to do, and the question of whether particular military operations are necessary and appropriate or whether they are necessary to protect the national security of the United States against a particular threat, those are the kinds of questions that are committed to the political branches by the Constitution. So maybe the answer is before, and I didn't get it. So give me an example of where there would be a violation of the AUMF that we could enforce. Well, Judge Griffith, I think the Guantanamo cases that you were referring to are the kinds of cases where those questions can be litigated. The question isn't where there's been a violation. No. Is there an example in which the President initiates hostilities that's beyond the scope of the AUMF and a plaintiff whose standing comes here and challenges it? Do we have authority to enforce the AUMF against? Against the President, Judge Griffith? Yes, Judge Griffith, yes. I think not, probably, and I think there are multiple reasons, as we've discussed in our briefing today, why that's the case. Again, as Judge Sintel pointed out, there are lots of collateral windows into some. What then was the purpose of the AUMF? Why go to Congress to announce that there's a scope of war-making powers that we're going to engage in and it's limited? Because that can't be enforced. Oh, I think it can be enforced, Judge Griffith. But just not by us. But not in court, and I think that's the whole point. Well, that's what happened in the Cambodian bombing. Exactly. And the issues that you're discussing were the same issues that were discussed before the Supreme Court, and there was an Eagleton-Fulbright statute that seemed to prohibit the bombing and the back-and-forth, and the Supreme Court dissolved the stay, and Congress passed a law that had, I think it was August 15, 1973, that ended all funding for the Cambodian action, and the President complied with it. That's what you're saying. That's the way it should work. I think that's right, Judge Randolph. This is a political, ongoing political discussion and dialogue between the two elected branches, and they have ample powers as between them to resolve these questions. Judge Griffith, your question whether there's any purpose to the AOMF, I think there is, but, again, may not be a purpose that's subject to judicial resolution in a case like this. At the risk of extending what's already been extended lots of times, going back to the standing terms, normally in analyzing spending, we require that the alleged injury be remediable in the action. When I asked your friend there what kind of remedy we're issuing, he said, Well, if you say it's declaratory, the President will probably comply with it. Is this even remediable in this court, in this action, where they're asking for a declaratory judgment, if there is a violation of an injury, rather, to the alleged plaintiff, can we remedy it in this action? I don't think that If all we can do is issue the declaration. Judge Sintel, I think you're right. The relief that the plaintiff here has requested would not change the legal relationship between the plaintiff and the controversy he's identified, and that's why we think this would be an advisory opinion. Okay, thank you. Thank you, Your Honor. If the Court has no further questions, I would ask you to affirm. Thank you very much. We're going to give you one minute on standing, Mr. Green. I wanted to distinguish this case from Radyomar, which is that, in that case, the Court ruled that Radyomar, the State Department official, had not been ordered to do anything specific. In this case, Smith was ordered to do something specific, namely, support intelligence for Operation Inherent Resolvement. The second point, I want to clarify our point. I want to go to Judge Randolph's point about have we ever approved a declaratory judgment action against the President, and I think that it's implicit in this Court's decision in Swan v. Clinton that if there is no other way to achieve the result required by the law, a declaratory judgment can be issued against the President. We discussed that at the end. And finally, I'd like to clarify. What year was that? Swan? No. Okay. Okay. Pardon me while I check my table of authorities. It was recent. That's all I can say. It's recent. That's all I can say, Your Honor. I don't have the year of the citation. I pulled out my notes. You know, what I had in mind was our opinion in Newdow v. Roberts, which is, I don't know if it's cited. It's 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. That's 2010. And it says, with regard to the President's courts, do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief. So you're saying that's wrong? It's never been, right? This decision, Swan v. Clinton, was decided in 1996, 100 F. 3rd 973, but it's still binding authority on the panel of courts because it hasn't been overruled. And the decision you cite is not contrary. What's your language from that Swan case? Well, in Swan. You gave us what you said was its conclusion. What is the language the court used? This court said that officials other than the President, quote, could on balance substantially redress Swan's injury by treating him as a de facto member of the board that he sought to continue to be on. And now there's some dictum, right? Excuse me? No, go on. And that if Swan had been able to identify those officers. Are you quoting the court now? Excuse me, sir? Are you quoting the court now? Well, I have to lead into the court. No, you have to give me the quote. Okay. We're in charge here, and that's what I'm asking for. The court considered it, quote, indisputable that Swan would have named those subordinate officials had he thought that the suit against the subordinate officials would not be sufficient to provide the relief he desires. So the point is that it doesn't matter whether or not, or I should say, the significance of the case is that if a declaratory judgment directed at the President is the only way. What did we finally hold in that case? What you held is that the subordinate officers could de facto provide Swan with the relief that he sought, even though that is he could substantially give him the relief he sought. Anything about being impossible to enjoin the President is dictum, right? There was no injunction action here. There is no injunction action here. Anything but declaratory judgment against the President is also dictum, right? I'm sorry, Your Honor. Anything about declaratory relief against the President is dictum, right? Not a holding. Well, it seems to me that it is a holding, but the court was saying that the subordinate officers can substantially provide the relief sought. They should be the ones. They can provide the relief, and the suit does not need to be brought against the President. And, therefore, it did not need to be decided whether there could be a declaratory relief against the President, right? That's what we called dictum, isn't it? Well, I suppose it was the court's way of saying. I think it was not dictum to say that if you can't. Right. Great. Thank you very much. We appreciate it. Thank you. Professor Ackerman, we're going to give you back one minute to talk about the political question. As the government made clear, if the court fails to act in this case, it will have established a precedent that permits future Presidents of the United States, on their mere assertion, without an opinion by the Office of Legal Counsel or the White House Counsel, to assert that one or another terrorist group, without any provision of evidence to anybody, is an object of war. Forever. And this is a fundamental case. And in the face of a self-conscious refusal in 2001, a rejection of President Bush's initial request for authority to preempt future attacks, and in the face of a self-conscious decision in 2012 to deny, refuse to expand the authority to war-making while expanding the authority for detention. Thank you. Thank you very much. I appreciate it very much. Thank you, counsel. The case is submitted.
judges: Griffith, Sentelle, Randolph